IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 14, 2019

**JOSHUA ICEMAN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for White County**
**No. 2011-CR-5205  David A. Patterson, Judge**

_____

**No. M2018-02202-CCA-R3-PC**

_____

The petitioner, Joshua Iceman, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ALAN E. GLENN, JJ., joined.

Michael J. Rocco (on appeal) and Daniel J. Barnes (at trial), Sparta, Tennessee, for the appellant, Joshua Taylor Iceman.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Philip A. Hatch, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

*A. Trial*

The petitioner was convicted of aggravated child abuse and first degree felony murder.  *State v. Joshua Iceman*, No. M2016-00975-CCA-R3-CD, 2017 WL 4805118 (Tenn. Crim. App. October 24, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018).  He received concurrent terms of eighteen years for the aggravated child abuse conviction and life imprisonment for the felony murder conviction, resulting in an effective life sentence. *Id*. at *19.  This Court affirmed his convictions and sentence on appeal. *Id*.  Because the

testimony from trial was extensive, the following is a summary of the relevant proof presented at trial as it relates to the petitioner's post-conviction claims.

On the evening of September 2, 2011, the petitioner was home alone with his eight-week-old daughter, the victim, while the victim's mother was working night shift. According to the petitioner, the child had been crying all evening. Shortly after midnight, September 3, the petitioner realized the victim was not breathing, and he took her to White County Hospital in Sparta, Tennessee. The victim died on the evening of September 5, 2011, after suffering extensive injuries to her head, ribs, and legs. Her autopsy revealed she suffered "both subdural and subgaleal hematomas," "subarachonoid hemorrhaging," bruising on the head and ears, bleeding underneath the scalp, in the back of the neck, in the brain and in the spinal cord, "extensive" retinal hemorrhaging, "global cerebral ischemic changes," fractures of the ribs, and "metaphysical fractures, both legs." When questioned by law enforcement, the petitioner admitted to being frustrated with the victim because she would not stop crying, and he shook the child at one point during the evening.

The State's theory at trial was that the victim died as a result of shaken-baby syndrome and/or physical abuse. The State presented two medical experts to corroborate this theory. Dr. Adele Lewis, who conducted the victim's autopsy, testified as an expert in the field of forensic psychology. Dr. Lewis opined that the victim's rib fractures were "very suspicious for abuse," and that within a reasonable degree of medical certainty, the victim's cause of death was homicide due to "multiple blunt force injuries," with many injuries being indicative of shaking. Dr. Annamaria Church, an expert in pediatrics and pediatric trauma, testified the primary cause of retinal hemorrhaging in infants is non-accidental trauma or abusive head trauma. Dr. Church opined that within a reasonable degree of medical certainty, the victim suffered major head trauma as a result of physical abuse.

In addition to the medical proof, the State introduced a statement given by the petitioner on September 13, 2011, to Agent Dan Friel of the Tennessee Bureau of Investigation. After being properly advised of his *Miranda*[1] rights, the petitioner signed a *Miranda* waiver and spoke with Agent Friel for approximately one hour and seven minutes. At the conclusion of the interview, Agent Friel provided a written summary of the petitioner's statement, which the petitioner reviewed, edited, initialed throughout, and signed. The statement read as follows:

> It was an accident, [the victim] was crying all night, and when [her mother] left to go to work [the victim] was still crying. I got upset with

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[the victim] and put her in her swing in the back bedroom. [The victim] was still crying, so I went on the balcony to cool off. I was out on the balcony for about [thirty] minutes, long enough to smoke two cigarettes, when I went back inside [the victim] was still crying. I was frustrated I did not know what to do to make [the victim] stop crying. I picked [the victim] up out of her swing and held her by her shoulders. I shook [the victim] and told her to stop crying. [The victim] still did not stop crying, so I put her back in her swing, and I left the room.

I went back in the room two hours later, and [the victim] was not breathing. . . . [The victim] was gasping for air. I tried CPR on [the victim] when it didn't work, I ran her to the hospital.

The petitioner challenged the State's theory of the case through the testimony of Dr. John Spencer Daniel III, an expert in forensic pathology. Dr. Daniel questioned the State's theory concerning the cause of death, explaining that the injuries suffered by the victim were not exclusive to shaken-baby syndrome. According to Dr. Daniel, the victim died from brain swelling which could have been caused by other medical issues not related to non-accidental trauma, including "lack of oxygen, infection in the brain, or trauma to the brain." Dr. Daniel opined there was not adequate testing done to determine if the victim had underlying bone problems, which could have explained the victim's rib fractures. He further stated lack of oxygen to the brain could result from heart problems affecting blood circulation, lung problems, or trauma to the brain.

On cross-examination, Dr. Daniel acknowledged his testimony contradicted testimony he provided in a separate case in 2001, where he stated that certain fractures, which were suffered by the victim in this case, were exclusive to shaken-baby syndrome. On redirect, Dr. Daniel explained his opinion had changed since 2001 after conversations with a pediatric neurosurgeon about a subsequent case he worked on. He further testified that he is not the only doctor whose opinion had changed on the matter and that "there's considerable controversy about these issues."

Based on the evidence produced at trial, the jury found the petitioner guilty of felony murder and aggravated child abuse. On appeal, this Court affirmed the petitioner's convictions.

*B. Post-Conviction*

The petitioner subsequently filed a pro se petition for post-conviction relief, which was amended after the appointment of counsel. In the amended petition, the petitioner argued trial counsel was ineffective for: failing to speak to any witnesses for the State or

investigate witnesses requested by the petitioner; failing to adequately confer with the petitioner about trial strategy; failing to file a motion to suppress the petitioner's written statement to law enforcement; and failing to object to the introduction of the petitioner's statements to two White County Hospital nurses.

At the subsequent evidentiary hearing, trial counsel and the petitioner both testified. The petitioner testified trial counsel met with him about three times prior to trial for "[a]ltogether maybe an hour." According to the petitioner, trial counsel did not adequately prepare for trial. For example, trial counsel did not properly investigate Dr. Daniel's history as an expert witness before presenting him as a witness. The petitioner argued that trial counsel was ineffective for failing to discover Dr. Daniel's testimony in the 2001 case, which contradicted his testimony in this case. The petitioner claimed this prejudiced his case because it allowed the State to impeach Dr. Daniel with his prior testimony.

The petitioner also claimed trial counsel should have objected to the trial testimony of Nurse Cantrell and Nurse Simpson, of White County Hospital. The petitioner argued trial counsel should have objected to Nurse Cantrell's statement that the petitioner appeared "relatively calm" at the hospital "because she is not an expert in psychological field or any such thing like that." Trial counsel also should have objected to Nurse Simpson's statement that the petitioner "[s]eemed kind of withdrawn" and "something just wasn't right" because these statements gave the jury the impression the petitioner did not care about the victim. On cross-examination, the petitioner admitted trial counsel addressed all of the petitioner's concerns when trial counsel cross-examined the nurses.

Though not addressed on direct examination, the petitioner claimed in his petition that trial counsel was ineffective by failing to interview any of the State's witnesses. When asked about this claim on cross-examination, the petitioner admitted trial counsel reviewed the list of the State's witnesses with the petitioner. He also agreed that trial counsel's best strategy was to focus on medical proof and that strategy is best-effectuated by reviewing the medical documentation and cross-examining the State's witnesses. When questioned further about trial counsel's preparation, the petitioner conceded trial counsel adequately prepared for cross-examination of the State's witnesses.

The petitioner also claimed trial counsel was ineffective because he failed to interview two potential witnesses, Leesha Jordan and another witness whose name the petitioner could not remember. However, the petitioner acknowledged neither potential witness was in his apartment during the early morning hours of September 3, 2011, and only one of them had seen the petitioner on September 2.

- 4 -

The petitioner next claimed trial counsel was ineffective for failing to file a motion to suppress the petitioner's statement to Agent Friel, which stated in relevant part that the petitioner "shook [the victim] and told her to stop crying." The petitioner testified that he did not write the statement and that it was not verbatim what he said to Agent Friel. The petitioner claimed the statement was inaccurate but did not specify how it was inaccurate. Trial counsel did not file a motion to suppress the statement nor did he object to its introduction at trial to preserve the issue for appeal. On cross-examination, the petitioner admitted he willingly signed a *Miranda* waiver when he was interviewed by Agent Friel. He also admitted he identified an issue in the middle of the statement and initialed next to any changes but claimed he signed his statement without reviewing it.

Trial counsel also testified at the post-conviction hearing. According to trial counsel, the petitioner agreed the best defense strategy was to focus on medical proof. To develop that strategy, trial counsel determined he should spend most of his time reviewing the medical documentation and preparing for cross-examination of the State's witnesses. Trial counsel maintained a list of witnesses to contact before trial. He attempted to contact all of the State's witnesses and was able to speak with some of them.[2] Trial counsel did not recall the petitioner asking him to contact any witnesses other than those on the State's witness list. Trial counsel also stated that he was able to cross-examine the State's expert witnesses at a motion hearing and spent significant time preparing for cross-examination of all the State's witnesses.

When asked about the petitioner's written statement to Agent Friel, trial counsel testified he made a tactical decision not to object to the introduction of the statement. He believed the petitioner made the statement willfully, and although the words were incriminating, trial counsel's best tactic was to attack the veracity of the statement through cross-examination. Trial counsel explained:

> [T]he circumstances surrounding the statement, that it was given at a time when [the petitioner] was under much more turmoil with the, with what [the victim] was going through; that the statement was not in [the petitioner]'s handwriting; that the statement was a summary by [Agent] Friel; that at the time [Agent] Friel presented the statement to [the petitioner], [Agent] Friel did not know his education level, his ability to read; and that [Agent] Friel had the opportunity to record a statement just like he did at the hospital, but chose not to do so, could give rise to the argument that the TBI did not get what they wanted at the hospital from

---

[2] The record does not indicate the names of the State's witnesses trial counsel spoke to from the witness list.

[the petitioner], so . . . that there would be reason to question the veracity of the statement.

Trial counsel did, in fact, implement that strategy at trial through his cross-examination of Agent Friel. He agreed, however, that "it would be better" if the statement had not been introduced to the jury.

Trial counsel stated he knew Dr. Daniel had testified on previous occasions for both the State and the defense and admitted he did not investigate any of Dr. Daniel's previous testimony for the State. After the State cross-examined Dr. Daniel regarding his 2001 testimony, trial counsel asked Dr. Daniel on redirect if his opinion had changed since 2001, to which Dr. Daniel confirmed it had. Trial counsel believed his redirect of Dr. Daniel was sufficient to rehabilitate the witness.

After the review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

## *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to file a motion to suppress the petitioner's statement to Agent Friel and for failing to adequately prepare the petitioner's expert, Dr. Daniel. The State contends trial counsel made a reasonable, tactical decision not to object to the statement and trial counsel effectively prepared and questioned Dr. Daniel. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. Prejudice requires

proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id*.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see Dellinger*, 279 S.W.3d at 293-94. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id*. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id*. at 457.

## A. Statement to Agent Friel

The petitioner argues trial counsel was ineffective for failing to file a motion to suppress the petitioner's statement to Agent Friel, in which the petitioner admitted to shaking the victim. Specifically, the petitioner argues, "[g]iven the case at trial essentially rested on medical proof regarding the effects of shaking an infant, it cannot be said foregoing an opportunity to suppress statements admitting to that important element was a sound trial strategy." He contends that there was a good faith basis for a motion to suppress based on the involuntary nature of the statement and that trial counsel's doubts about the success of a motion to suppress the statement "would not relieve him of challenging" the admission of the statement. The State argues the statement was not

involuntary and trial counsel's decision to not file a motion to suppress was a sound trial strategy.

To prove prejudice on a claim that trial counsel was ineffective for failing to file a motion to suppress, a petitioner must show "(1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed* (citing *Vaughn v. State*, 202 S.W.3d 103, 120 (Tenn. 2006)). Therefore, "[i]f a petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to . . . file a motion to suppress . . . the petitioner is generally obliged to present . . . the [evidence supporting the claim] at the post-conviction hearing in order to satisfy the *Strickland* prejudice prong." *Demarcus Sanders v. State*, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415, at *4 (Tenn. Crim. App. Nov. 8, 2013), *perm. app. denied* (Tenn. Mar. 17, 2014).

The petitioner has failed to show that trial counsel was ineffective for not filing a motion to suppress the statement. Trial counsel testified that because the petitioner voluntarily and knowingly signed a *Miranda* waiver, he believed a suppression motion would not have been successful. Thus, trial counsel determined the more prudent strategy was to attack the veracity of the statement through cross-examination. The petitioner introduced no evidence at the post-conviction hearing to indicate that his statement was involuntary. While he argues trial counsel had a good-faith basis for filing a motion to suppress, the petitioner has failed to demonstrate how such a motion would have been successful. In fact, the record demonstrates a motion to suppress would not have been successful.

During the meeting with Agent Friel, the petitioner was advised of his rights both orally and in writing. The petitioner then initialed each right on the form and signed the form. He subsequently made changes to the statement, initialed those changes, and signed the statement. The post-conviction court found that a motion to suppress would not have been successful even if filed, and we agree. Because the record indicates the petitioner provided a knowing and voluntary statement that was likely not subject to suppression, the petitioner cannot establish prejudice and he is not entitled to relief. *See Ricky Ronell Jones v. State*, No. W2011-02737-CCA-R3-PC, 2013 WL 238205, at *7 (Tenn. Crim. App. Jan. 22, 2013) (denying post-conviction relief because the petitioner failed to show that a motion to suppress his voluntary statement would have been successful even if filed), *no perm. app. filed*.

### B.  Investigation of Dr. Daniel

The petitioner also argues trial counsel was ineffective for failing to sufficiently vet Dr. Daniel before presenting him as an expert witness.  Specifically, the petitioner claims he was prejudiced by Dr. Daniel because Dr. Daniel previously testified in a 2001 case that certain injuries, similar to the ones suffered by the victim, were caused exclusively by shaken-baby syndrome.  Through cross-examination, the State was able to impeach Dr. Daniel with his prior testimony from 2001.  The State contends that trial counsel sufficiently rehabilitated Dr. Daniel on redirect and, therefore, the petitioner has failed to show prejudice.  We agree with the State.

When cross-examined by the State, Dr. Daniel was asked about his 2001 testimony.  Specifically, Dr. Daniel was asked if he had testified previously that injuries, similar to the ones suffered by the victim, could only be caused by shaking a child.  While Dr. Daniel had given such testimony some fifteen years prior, Dr. Daniel testified, on re-direct, that his opinion had changed since 2001 based on further research and conversations with a pediatric neurosurgeon.  He also testified that he was not the only doctor to have changed his position on this issue.  While the State was able to impeach Dr. Daniel, trial counsel effectively rehabilitated Dr. Daniel by showing his testimony for the defense was credible despite his conflicting testimony from 2001.  Accordingly, the petitioner has not shown he was prejudiced by Dr. Daniel's testimony, and he is not entitled to relief on this issue.  *See Goad*, 938 S.W.2d at 370 (Tenn. 1996).

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE